HENRY SCHNEIDER and Another, Plaintiffs, *v.* 44-84 REALTY CORPORATION, Defendant.

Supreme Court, Special Term, Bronx County, October 7, 1938.

*Oberwager & Oberwager*, for the plaintiffs.

*A. J. Halpern*, for the defendant.

HAMMER, J. Upwards of sixty years ago one Susie Jefferson owned and resided at property on the northerly side of One Hundred and Seventy-sixth street, between Morris avenue and what is now the Grand Concourse, Bronx, New York city. On part of the property adjoining her residence she erected homes for her two sons, Thomas and Edwin, who were then married, and their families, and conveyed the property severally to her two sons. The premises conveyed are now known as Nos. 151 and 153 East One Hundred and Seventy-sixth street, each plot being about 44 feet by 125 feet. Thomas owned and resided in the former, which, in the year 1925, he conveyed to the plaintiffs. Edwin owned the latter, which he conveyed to one Joseph Smiegel, from whom, through mesne conveyances, it became owned by the defendant. The structure erected provided double frame houses having the outer appearance of a single house, through uniformity of architecture, and in particular of the windows and a bay window or dormer in the attic. While there were two separate entrances, the whole scheme and design was to have the appearance of one building. The structure was trimmed at the roof, corners, windows, the porch and balcony to give balance to and further the uniformity of design. In the attic there was a door through which the occupants of the houses had access to each other's premises. The roof was of the gable or triangular type.

The evidence is that the deeds of conveyance granted the respective properties by descriptions which divided the properties by a party wall. The fact is that a wall, which consisted of an eighteen-inch stone foundation, the usual plates and four-inch uprights or studs with the usual bridging or braces, was erected as a dividing wall between the houses. It appears that long after the erection of the wall and prior to the conveyance to either the plaintiffs or the defendant a fire occurred in one of the houses, and as a result this wall was brickfilled, and the attic doorway closed by the brick fill. This, the evidence shows, was required by the insurance authorities as a fire preventive measure. The gable roof, which was uniform in appearance, covered the two separate portions of the double house. A ridge pole or beam at the upper horizontal angle or edge of the roof appears to have been supported by king poles at either end, and it may be assumed also in the center. The rafters were beveled and attached to the ridge beam, which formed the backbone of the structure. There are several rooms in the attic of plaintiffs' building, No. 151, but the evidence does not show that queen posts were used, so it may be assumed that the

walls of the rooms were formed by the party wall studs and ordinary partition studs. The plaintiffs' witnesses testified that the rafters were held by horizontal collar beams connecting the various pairs of rafters running down to the floor or tie beams and that the collar beams were located about three feet from the ridge beam or pole. It seems that the purpose of tie beams, which formed the base of the roof triangle, is to act as tie or tension pieces which keep the rafters from receding from the king pole, and that the function of the collar beams is to connect opposite rafters and prevent them from spreading or bending in or sagging. A scale model offered by defendant shows the king pole as ten and one-eighth feet, the rafters as eighteen and one-eighth feet and the tie beams as fourteen and one-half feet. The engineer who produced the model testified, as also did defendant's architect, that what plaintiffs' experts testified were collar beams placed about two and one-half feet below the ridge were not such, but in reality ceiling beams of attic rooms. Since there were attic rooms these beams, being about seven to seven and one-half feet above the floor beams, no doubt were used as ceiling beams. As such they would have been fastened more probably to the studs in the party wall, which was also a wall of the rooms, instead of being suspended as defendant contends in the brick fill without other support or anchorage. Fastened to opposite rafters two and one-half feet below the ridge, such collar beams would be about eight feet long, but ceiling beams in the same location would only need to be four feet or less. The former seems the better and more likely construction. As the wrecker, who alone could give direct testimony of sawing or not sawing these beams, was not a witness, under all the facts the conclusion is clear that they were collar beams — extending to opposite rafters, were cut and left suspended in holes in the brick fill. Whether or not there were struts or stretching pieces running from the king pole to the rafters to act as compression members to keep the rafters and king pole at practically stationary distances and from approaching nearer together does not appear.

Plaintiffs are husband and wife, and with their family have occupied premises No. 151 as their home since the purchase of same by them on or about October 15, 1925. They and their neighbor, occupying No. 153, kept the structure in uniform appearance by common enterprise, through painting and outward repairs, the expense of which was jointly shared. Defendant purchased No. 153 and an adjacent plot to the east, intending to erect thereon a large six-story apartment house, for which it filed with the department of housing and buildings plans which have been approved. Defendant also sought to purchase from the plaintiffs, at a price

named by the defendant, plaintiffs' property, to be included in the plot intended to be improved, but plaintiffs would not sell at the offered price. Defendant then authorized a broker to negotiate with the holder of the mortgage of plaintiffs' property in an attempt to purchase same at a discount. The effort was unsuccessful. Thereafter, and on or about August seventeenth, the defendant, through a house wrecker and without obtaining a permit from the department of housing and buildings, cut off the roof at the ridge, cut the collar beams, demolished the various parts of the structure on defendant's property. Among other things, the wrecker cut a ridge running across the apex of two dormers, one of which was on the westerly side of 151, and the other on the easterly side of 153, and removed the portion of such ridge, as well as the dormer, on defendant's premises, No. 153. A stop order and an unsafe violation for proceeding without a permit was issued by the department of housing and buildings, but a permit was applied for and issued on August eighteenth.

There is testimony by the plaintiffs that a representative of the defendant threatened that unless plaintiffs sold their property at the price suggested defendant would demolish its building and thus render plaintiffs' property unsafe for occupancy. There is evidence, also, that since the demolition was commenced by defendant, plaintiffs' property has been damaged by water, which seeped in through exposure at the roof and in the party wall. In the course of demolition defendant demolished that portion of the attic front bay window which was on defendant's property, and plaintiffs' portion of the bay window was left hanging in the air with its easterly side open and exposed to the weather. It appears defendant covered the opening with strips of metal.

The action brought is for an injunction and damages, and an injunction *pendente lite* has been granted restraining defendant from proceeding with the demolition. Undoubtedly the wall dividing the two portions of the premises is a party wall, by grant, by the facts in respect of the building of same with the express intention of having it as a party wall, and by the continuous acquiescence of the owners of the land upon which it stands. Since it has existed practically in the same condition as a party wall for more than twenty years it has become an ancient wall. (*Wright* v. *Freeman*, 5 Harris & J. 467.) The plaintiffs then had a right to it as an easement and the defendant could not withdraw the wall or change its condition to the injury of plaintiffs or plaintiffs' property without being liable in damages for any injury that might accrue to the plaintiffs thereby. (*Hide* v. *Thornborough*, 2 Car. & Kir. 250.) The buildings and their appurtenances are ancient and by

prescription are entitled to special privilege of being exempt from the consequences of the spirit of reform operating on the owners of the adjacent lots. The respective rights of the parties have also been granted in their present situation by the owners of the adjacent lots and by those under whom they derived their title. (*Palmer* v. *Fleshees*, 1 Sid. 167; *Cox* v. *Matthews*, 1 Vent. 237, 239; *Story* v. *Oden*, 12 Mass. 157; *Brown* v. *Windsor*, 1 Cromp. & J. 20.) The plaintiffs, then, are entitled to full protection against the consequences of any alteration of the premises intended to be improved, by which plaintiffs' property may be in any way prejudiced. (*Lasala* v. *Hilbrook*, 4 Paige, 173; *Eno* v. *Del Vecchio*, 11 N. Y. Super. Ct. 53.)

A party wall is a structure for the common benefit and convenience of both tenements which it separates. Either party making a change when not required for purposes of repair is responsible for any damage which it occasions. (*Brooks* v. *Curtis*, 50 N. Y. 639, 642, 644, 645; *Rogers* v. *Sunsheimer*, Id. 646, 649; *Schile* v. *Brokhahus*, 80 id. 614, 618.) The use of a party wall by either adjoining owner is restricted to such use as shall not be detrimental to the other. (*Negus* v. *Becker*, 143 N. Y. 303.) Even if the defendant proceeded with all skill and diligence it is still liable to the plaintiffs for any injuries sustained in consequence of the intended alterations to the wall and to the support which the building on defendant's premises gave to the plaintiffs' property. As a result of the demolition of one-half of what was a uniform gable roof over the entire structure, what was previously a gable roof has now become in effect a lean-to roof. It may be that the roof as it remains is reasonably safe and secure. There is no authority called to my attention, nor does there appear to be any, which would render defendant liable to plaintiffs because of the loss of the architectural beauty or uniformity of plaintiffs' building. It seems under the authorities, however, that plaintiffs are entitled to damages for defendant's act in exposing the party wall to the elements, which resulted in damage to the interior of plaintiffs' premises. It would seem also that plaintiffs are entitled to damages to the attic bay window and damages by reason of cutting the dormer ridge and the collar beams. Plaintiffs are also entitled to have their building secure against the elements. Defendant's witnesses testified that the necessary work required to give complete relief to plaintiffs was the sum of $365. Plaintiffs' experts, on the other hand, testified that the damage could be repaired only by the expenditure of a sum running from $3,500 to $5,000.

In my opinion the injury done by the defendant to the plaintiffs' building will require the expenditure for repairs in putting it in the

condition in which it was prior to the commencement of demolition of the sum of $1,350. This amount I assess to be plaintiffs' damages. Defendant's obligations in respect of the construction of the apartment house intended to be erected are fixed by law and the same are not considered or decided in the present action. Under all the circumstances I am convinced that payment of the damages assessed will give adequate relief to plaintiffs. However, defendant, in addition, will be directed to permit plaintiffs and their agents, servants and employees reasonable access to and upon defendant's property to make such necessary repairs to plaintiffs' property, side wall and roof, including siding and clapboards or metal lathing with cement and waterproof stucco, and all incidentals thereto as are required by the judgment to be entered herein. In the foregoing event it would appear that defendant should not be enjoined from its contemplated use of its property. Costs are awarded to plaintiffs.

Submit decision and judgment accordingly on notice.

Opinion on application for treble damages, October 19, 1938.

Plaintiffs assert they are entitled to treble damages under subdivision 3 of section 1433 of the Penal Law, for the asserted unlawful and willful injury of their real property by defendants. Other than the statute no authorities are cited in support of such claim. As defendant had the right in the use of its property to demolish the building thereon it is obvious that the injury which it thus occasioned to plaintiffs' real property is not of the character within the inhibition of the statute. A civil action for treble damage under the statute is a law action. The action here is in equity for injunction and incidental damage. Had plaintiffs desired to sue under the statute they should have clearly apprised defendant and the court of the presently asserted theory. That was not done.

In such a civil action the complaint must state facts sufficient to constitute a crime under subdivision 3 of section 1433 of the Penal Law. A willful as well as an unlawful destruction of or injury to property must be pleaded and proved. Claim for treble damages under section 535 of the Real Property Law, subdivision 3 of section 1433 of the Penal Law, and section 435 of the Civil Practice Act cannot be raised for the first time after decision rendered when the complaint did not ask treble damages. (*Yeamans* v. *Nichols*, 81 N. Y. Supp. 500; *Salmon* v. *Blasur Mfg. Co.*, 123 App. Div. 171.)

Findings and conclusions marked. Submit decision and judgment on notice.